IRVING, J., for the Court.
¶ 1. Scotty B. Lyles was convicted in the Oktibbeha County Circuit Court of armed robbery and sentenced as a habitual offender to life imprisonment, without eligibility for parole, in the custody of the Mississippi Department of Corrections and fined $10,000. Lyles moved for a new trial, but the circuit court denied the motion. Aggrieved, Lyles appeals and asserts that the circuit court erred in denying his motion for a new trial because the verdict was against the overwhelming weight of the evidence.
¶ 2. Finding no reversible error, we affirm.
FACTS
11 3. The Tobacco Shed is a convenience store located in Starkville, Mississippi. On the morning of May 22, 2006, business ran as usual at the Tobacco Shed, as Janice Kilgore, the store manager, waited on several customers. At approximately 10:30 a.m., a man wearing all black clothing en *553 tered the store and robbed Kilgore at knife point. Kilgore and the robber were the only two people in the store during the robbery; however, the robbery was captured by the store’s surveillance camera. After several witnesses positively identified Lyles as the robber, he was indicted.
¶ 4. At trial, during the State’s case-in-chief, Kilgore testified that she had identified Lyles in a photographic lineup at the Starkville Police Department. She also identified Lyles in the courtroom. Kilgore stated that she had “no doubt at all” that Lyles was the man who had robbed her.
¶ 5. The State’s next witness, Donna Arnold, testified that she had just purchased a few items from the Tobacco Shed and had walked out of the store when she saw Kilgore run outside and scream, “I’ve been robbed. I’ve been robbed. There he go [sic]. There he go [sic].” Arnold further testified that she did not see the robber’s face but that she remembered the robber as being tall, slender, and dressed in all black. According to Arnold, she had previously stated to the police that the robber looked like he was twenty to thirty years old.
¶ 6. The State’s next witness, Deputy Terry Scott of the Clay County Sheriffs Department, testified that on May 25, 2006, the Starkville Police Department informed him that Lyles was in the Mantee area — a town in Deputy Scott’s jurisdiction. According to Deputy Scott, he and three detectives from the Starkville Police Department found Lyles at a car wash in Mantee. Deputy Scott stated that he and the other officers found a black cap in the back seat of Lyles’s car and that they transported Lyles back to Starkville.
¶ 7. The State’s next witness, Priscilla Logan, testified that she knew Lyles because he was a frequent customer at Green Oakes Cigarettes,[1] a convenience store where Logan was employed. She testified that Lyles would often come to Green Oakes Cigarettes to cash his payroll checks. Logan further testified that she identified the robber as Lyles after watching the surveillance video recording. She also identified him in the courtroom when she testified at trial.
¶ 8. During Lyles’s case-in-chief, he called his wife, Novella, as his first witness. On direct examination, Novella testified that she and Lyles went to a car wash on May 22, 2006, before noon, that Lyles was wearing peach colored shorts with a tan shirt and red hat on that day, and that the man who appeared on the video recording was not Lyles. However, on cross-examination, Novella testified that she told the Starkville police a few days after the robbery that she was eighty percent sure that the man who was shown on the video recording was Lyles. She also testified that it was possible that she was intoxicated during her police interview.
¶ 9. Lyles’s next witness, Mary Miles, testified that she was standing outside of Green Oakes Cigarettes when she saw a lady run out of the Tobacco Shed “hollering and screaming and calling for help.” She further testified that the robber ran right past her and that the robber was tall, dark, and wearing all black. After being asked to compare the robber’s skin complexion with Lyles, Miles stated that the robber was “maybe a little darker than [Lyles].” On cross-examination, Miles testified that because the robber had on all black clothing, she was not certain if the robber was lighter or darker than Lyles.
*554 ¶ 10. Following Miles’s testimony, the court read into the record the following statement given by Charles Jordan, a witness to the robbery, on May 22, 2006, to Detective Armstead[2] of the Starkville Police Department:
Charles Jordan stated he came to the store when he saw the clerk running outside. He stated that she told him to follow [the robber] to see where he went. He stated he went to Ray Ford Park’s house and waited to see which way [the robber] went. He said he didn’t see [the robber] any more and came to tell Dan Morgan what had happened. Jordan stated that [the robber] was about 6 foot 2 and had on all black with a hooded shirt.
¶ 11. Lyles re-called Novella as a witness. She testified that Kilgore lived two houses down from them. Novella further testified that when she went on her daily walks with Lyles or one of her children, she would speak to Kilgore if she saw her. On cross-examination, Novella stated that she believed Kilgore had seen Lyles’s face before the robbery and that she believed Kilgore would know his face even if she did not know his name.
¶ 12. The State called Lyles’s stepdaughter, Alexandria Burchfield, as a rebuttal witness. She testified that after she watched the video recording of the robbery, she was 100 percent sure that the robber was Lyles. On cross-examination, Burchfield admitted that she had told the police that she did not like Lyles. Burch-field gave no explanation as to why she did not like him; however, she told the circuit court that even though she and Lyles did not have the best relationship, she did not want to see him go to jail.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 13. In Bush v. State, 895 So.2d 836, 844(¶ 18) (Miss.2005), the Mississippi Supreme Court announced the standard of review of a circuit court’s denial of a motion for a new trial as follows:
When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. Herring v. State, 691 So.2d 948, 957 (Miss.1997). We have stated that on a motion for new trial, “the court sits as a thirteenth juror. The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.” Amiker v. Drugs For Less, Inc., 796 So.2d 942, 947 (Miss.2000). However, the evidence should be weighed in the light most favorable to the verdict. Herring, 691 So.2d at 957. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, “unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict.” McQueen v. State, 423 So.2d 800, 803 (Miss.1982). Rather, as the “thirteenth juror,” the court simply disagrees with the jury’s resolution of the conflicting testimony. Id. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Id. Instead, the proper remedy is to grant a new trial.
¶ 14. Lyles argues that the witnesses’ testimonies were conflicting and that a *555 new trial should be granted. Specifically, Lyles points out several portions of the witnesses’ testimonies that he argues are inconsistent and discrepant. First, Lyles appears to argue that Kilgore’s identification of him should be discounted because her identification stemmed from her knowledge of him from the neighborhood, not from her view of him during the robbery. Second, Lyles points out that Arnold described the robber as being twenty to thirty years old, but that he was forty years old at the time of the trial. Third, Lyles points out that, notwithstanding Logan’s testimony that she saw his face on the surveillance video recording, the recording is not clear enough to identify him. Fourth, Lyles points out that even though Novella told the police that she was eighty percent sure it was Lyles on the videotape, she also stated that she was probably intoxicated during the interview. Lastly, Lyles argues that Burchfield was biased, as she admitted that she did not like him.
¶ 15. “It is a well-settled principle of law that issues of weight and credibility of witness testimony are within the sole province of the jury as fact-finder.” King v. State, 798 So.2d 1258, 1262(¶ 14) (Miss.2001) (citing Humphrey v. State, 759 So.2d 368, 387(¶ 60) (Miss.2000) (superceded by statute)). “The jury has a much better vantage point to view and assess the tone, mannerisms, and disposition of witnesses.” Id.
¶ 16. As stated above, in reviewing a motion for a new trial based on the weight of the evidence, we weigh the evidence in the light most favorable to the verdict. Here, three witnesses — Burchfield, Kil-gore, and Logan — were certain that Lyles was the person who had robbed the Tobacco Shed. Further, Kilgore identified the cap found in Lyles’s car as the cap worn by the robber during the robbery. Also, the jury convicted Lyles only after hearing the State’s and Lyles’s versions of events. The inconsistencies in the witnesses’ testimonies pointed out by Lyles were resolved by the jury’s verdict. In the case at bar, allowing the jury’s verdict to stand will not sanction an unconscionable injustice. Therefore, this contention of error is without merit.
¶ 17. THE JUDGMENT OF THE CIRCUIT COURT OF OKTIBBEHA COUNTY OF CONVICTION OF ARMED ROBBERY AND SENTENCE AS A HABITUAL OFFENDER OF LIFE IMPRISONMENT, WITHOUT ELIGIBILITY FOR PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND TO PAY A FINE OF $10,000 IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO OKTIB-BEHA COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.

. Green Oakes Cigarettes and the Tobacco Shed are owned and operated by Moreland, Inc. Sometimes, Logan worked at the Tobacco Shed as a cashier.

. Detective Armstead's first name is not in the record.