# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00647-COA

**MARCUS HARRIS A/K/A PEANUT**                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/31/2022 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/23/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Marcus Harris was indicted by a Tunica County grand jury for the attempted sexual battery of his daughter as an authority figure (Count I) and touching a child (the same daughter) for a lustful purpose as an authority figure (Count II).  After a jury trial, he was acquitted of Count I but convicted of Count II.  The trial court sentenced him to ten years in the custody of the Mississippi Department of Corrections, with four years suspended and six years to serve, followed by four years of supervised probation.  Harris appeals, claiming three errors: first, the State's repeated "use" of "certain critical" testimony allegedly denied him a fair trial; second, defense counsel provided ineffective assistance of counsel due to

numerous alleged deficiencies; finally, the evidence allegedly is insufficient to "support the verdict." Finding no error, we affirm.

## FACTS

¶2.     T.H.[1] is the natural child of Marcus Harris; her parents were never married. During the events at issue, T.H. was fourteen years old.  At some point between June 1, 2017, and December 31, 2017, T.H. went to visit her father, Harris.[2]  Harris decided that he, T.H., and his girlfriend Titobia Clark would visit a casino in Tunica.[3]  The three would spend the night in the same hotel room.

¶3.     That night, after eating pizza, T.H. stayed in the hotel room while Harris and Titobia were "downstairs" gambling.  It was undisputed that Harris returned to the hotel room first, while Titobia stayed on the casino floor.  T.H. was asleep, fully clothed, and in the bed lying "on her side" when Harris returned to the room.

¶4.     T.H. testified at trial that she was woken by the "noise" of Harris entering the hotel room.  She knew it was Harris because she had "seen him."  She then "fell back to sleep." She stated, "[T]hen I woke up again, and I had felt his hands on me trying to go in my pants, but he couldn't because my legs were closed."  She testified she felt the "lower part" of his body against her.  She explained that his hand was "inside" her underwear "in between [her]

---

[1]  We will refer to the victim as T.H. to protect her identity.

[2]  These are the dates alleged in the indictment. At trial, T.H. thought the visit was "sometime in the summertime," while Harris said it was on his wife's birthday in December.

[3]  Our record does not reveal the exact casino where this incident occurred.  Harris did not identify which casino when he testified. T.H. and Harris both admitted the casino was in Tunica County, Mississippi.

legs" and that he touched her "private."  She kept her legs closed so his hand could not go "into" her "private."  She stated that after he "took" his hand out, he moved his lower body against "[her] butt."  Later, Titobia came back to the room from gambling, and the three went to sleep for the night.

¶5.    The next day, the family left the casino.  T.H. testified that Harris asked her if she "remember[ed] anything," to which T.H. responded "no" because she was "scared."  T.H. explained that after the casino incident, Harris would "look in the window" at her when she got out of the shower and was "about to get dressed."

¶6.    After the incident, T.H. told Titobia's son about what happened.  In October 2018, T.H. sent a text message to Harris about it, and he responded. T.H. sent her mother a screenshot of that text message exchange.  Harris's responsive text message was introduced for identification at trial during the State's direct examination of T.H.[4]  The text message read:

> I'm lost of words . . . . call me just too here me out . . . causes life too shot and
> if I make u feel like that I'm very sorry and never want you to feel like that . .
> ilove you still here for u alway. . . [.]

¶7.    When T.H.'s mother discovered what had happened at the casino, she contacted the police.  She and T.H. went to the police station to discuss the matter.  A forensic interview was conducted over two months later on January 3, 2019.  After the interview, Harris was arrested.  A Tunica County grand jury indicted him for attempted sexual battery and the touching of a child for lustful purposes, both of which were allegedly committed by the

---

[4]  The text message was marked for identification but was never introduced into evidence at trial.

defendant while in a position of trust or authority.

¶8.     The trial began on March 28, 2022.  The State called T.H.'s mother first.  She lived in Memphis, Tennessee, with T.H.  and  testified T.H. was born in 2003 and was fourteen years old in 2017.  At the time of the incident, T.H. had visitation with Harris every other weekend.

¶9.     T.H.'s mother testified that on October 10, 2018, she received a text message from T.H., which was "out of the ordinary, disturbing."  She spoke to T.H. about the text and left work to drive home.  On the way home, she called the Memphis Police Department, and the Tennessee Department of Human Services (DHS) "also" got involved.   After DHS interviewed T.H., she contacted the Tunica Police Department, and an officer told her to come to the station.   T.H.'s mother met with Detective Favian Jones and a forensic interviewer.

¶10.   On cross-examination, T.H.'s mother explained she called T.H. after receiving the "very disturbing" text message.  T.H. said she sent the text because it "was hard for her to tell me."  After receiving the text, she immediately left work to go home.

¶11.   The State called Favian Jones, a lieutenant with the Tunica County Sheriff's Office, as its first witness.  Jones was a criminal investigator handling juvenile cases.  Jones explained that on October 15, 2018, he was at the office when T.H.'s mother appeared at the office "in reference to a molestation."  He interviewed her, and she explained what occurred with her daughter.  Jones immediately set up a forensic interview for the child with the Family Crisis Center in Oxford, Mississippi.  The interview was scheduled for January 3,

2019. Jones observed the interview from another room. As a result of what he observed in the child's interview, he had a warrant issued for Harris's arrest.

¶12. After Harris was arrested on February 15, 2019, Jones interviewed him. Jones testified that Harris admitted he had two children: a son with Titobia and a daughter named T.H. Jones testified that Harris also admitted he regularly visited the casinos, and the last time he went to a casino was with T.H. and his wife around December 19, 2017. They were allegedly there to celebrate his wife's birthday. On this particular casino visit, after the three ate pizza, he and his wife went downstairs "to the games," and T.H. stayed in the room upstairs. Harris admitted in the interview that when he went back to the room, his wife stayed downstairs and continued gambling. According to Jones, Harris told him that when he got back to the room, "he laid down in a bed with his daughter." His wife came back "ten minutes" later and got between him and T.H.

¶13. After asking more questions about Harris's statements, the State moved to introduce a video of the interview Jones had with Harris into evidence. That effort produced the following discussion:

| | |
|---|---|
| **STATE'S ATTORNEY:** | Your Honor, at this time State moves State's Exhibit 3 into evidence. |
| **THE COURT:** | Any objection? |
| **DEFENSE COUNSEL:** | No objection, Your Honor. . . . |
| **THE COURT:** | Is this the same interview that we just spent 40 minutes interrogating this witness about? |
| **STATE'S COUNSEL:** | Yes, Your Honor. But there's additional information he has not testified to. |
| **THE COURT:** | I understand that. What he has testified to, is it all on the tape? . . . |
| **THE COURT:** | I'm trying to figure out why we just wasted 40 minutes when you had the tape that you could've |

|                      |                                                                                                                                                                                                                                                                                                                                                                                                                      |
| -------------------- | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|                      | played and covered all of it. And it would've been coming out of the mouth of the defendant, as opposed to this witness. . . .                                                                                                                                                                                                                                                                                        |
| THE COURT:           | I didn't say it was improper. It's been a complete waste of time. . . .                                                                                                                                                                                                                                                                                                                                               |
| THE COURT:           | Not to mention the fact now you're going to get to tell the story twice, once through the witness and once through this tape, which, of course, will be that additionally prejudicial to the defendant. And I understand the State wants to be prejudicial to the defendant. But I don't know that -- you know, I don't know that it's exactly fair to allow the witness to go through what was said on the tape and then play the tape too. |
| STATE'S COUNSEL:     | Judge, it's the State's position that, given the fact that the entirety of the tape – he has not discussed the entirety of the tape.                                                                                                                                                                                                                                                                                   |
| STATE'S COUNSEL:     | Yes, Judge.                                                                                                                                                                                                                                                                                                                                                                                                            |
| THE COURT:           | So now we're going to spend another how long listening to this tape?                                                                                                                                                                                                                                                                                                                                                  |
| STATE'S COUNSEL:     | I certainly only can play portions of it. He has not objected to it. He has reviewed it. I can only play the portions that I deem that he has not testified to.                                                                                                                                                                                                                                                         |
| THE COURT:           | I mean, have you got it indexed so well that you can do that?                                                                                                                                                                                                                                                                                                                                                          |
| STATE'S COUNSEL:     | Yes, Judge.                                                                                                                                                                                                                                                                                                                                                                                                            |
| THE COURT:           | Well, I'm not going to - - I'm not going to tell you how to play it or how you're going to do it. I'm going to allow you to play the tape in any fashion you want to. . . .                                                                                                                                                                                                                                              |
| THE COURT:           | You want to object?                                                                                                                                                                                                                                                                                                                                                                                                    |
| DEFENSE COUNSEL:     | I was - - my objection was going to be before playing the tape that - - it's essentially the same objection as what asked and answered is, is that what happens is, when you get to go through evidence twice, it puts more weight on that specific piece of evidence than other pieces of evidence will have.                                                                                                           |
| THE COURT:           | I understand. I note your objection. You'll have a continuing objection to it.                                                                                                                                                                                                                                                                                                                                         |
| DEFENSE COUNSEL:     | Thank you, Your Honor.                                                                                                                                                                                                                                                                                                                                                                                                 |

6

| THE COURT: | If we hadn't done it this way, he wouldn't have had to object. And I don't know what the Supreme Court is going to say in the event of a conviction. All right. Let's get the witness brought in. |
|---|---|

The video was then played before the jury. After Detective Jones testified, the State called T.H. to testify. Her testimony was essentially the same as set out in the facts discussed above and will not be repeated here. After T.H. testified, the State rested.

¶14. Titobia Clark testified for the defense.[5] Titobia testified that she was married to Harris and that they had been married since "2017... 2018," but she explained they had dated for twenty-two years. Titobia explained that Harris told her when T.H.'s mother was pregnant with T.H. Titobia testified she loved T.H. and acted as her stepmother. She explained Harris spoiled T.H. and they had a good father/daughter relationship.

¶15. Titobia testified the casino trips were family getaways, where the kids could swim, and Harris and Titobia could gamble. She testified her kids would attend the casino trips, and T.H. did as well. She did not remember a time when Harris left the casino floor without her or a time when she came to the hotel room to find Harris and T.H. in the bed together.

¶16. Harris testified in his defense. He testified he had been married to Titobia for twenty-two years but had a sexual relationship with T.H.'s mother.[6] He learned she had been pregnant with T.H. "after the baby was born." Harris testified that he paid child support and eventually saw T.H. every other weekend. Harris testified he and T.H.'s mother did not get

_____

[5] Titobia specifically directed the court to refer to her as "Ms. Clark."

[6] Again, Titobia's testimony indicates they were married in 2017 or 2018, though she did not definitively indicate.

along, and she did not like him having visitation.

¶17. Harris explained that he would take his family to Tunica to "get the family out to have a good time." Harris would get the hotel room for free "most of the time" because of "comps off the cards."

¶18. Harris admitted that on October 15, 2018, he received a text message from T.H. The message was about T.H. not wanting to be "around me." He testified he was "shocked, confused, bothered, sick." Harris explained, "I love my daughter very much," and said that he "never in my life touched my daughter."

¶19. Harris explained why he responded the way he did to questions asked by the officers during his videotaped statement. He explained that when he was questioned about T.H., he started talking about Titobia's birthday trip to Tunica without being told that was the time T.H. was touched. He explained: "because that's the only weekend – that was the only weekend that I can think of that she might could use saying that – what was in her texts maybe." He testified that T.H. was "angry" with him because he "took" her phone when she was "sending inappropriate pictures."

¶20. Harris admitted that on Titobia's birthday in December 2017, he, T.H. and Titobia went to a casino and stayed in a room. He admitted they had pizza, and T.H. stayed in the room while he and Titobia "went to go to the gambling floor to have drinks and play." He stated, "I was – got too intoxicated," so he told Titobia he was going back to the room. He admitted he arrived at the room first, and Titobia came up later.

¶21. Once in the room, he testified, he went to sleep, fully clothed, on "top of the bed."

Harris testified that T.H. acted normally the next morning. He further stated that T.H. stayed with him the rest of the weekend and continued with the normal visitation schedule.

¶22. On cross-examination, Harris admitted almost all the details T.H. gave except that he touched her. He also admitted to telling the police during his videotaped statement after his arrest, "I don't know. Maybe I thought she was my wife?" He maintained that T.H. lied about him looking into a window after she showered and about him touching her at the casino.

¶23. After the evidence was presented, the jury acquitted Harris of Count I (attempted sexual battery of a child by an authority figure) but convicted him of Count II (touching of a child for a lustful purpose by an authority figure). He was sentenced to serve ten years in custody, with four years suspended and six years to serve, followed by four years of supervised probation. He appeals, claiming that the State's "use" of "certain critical" testimony denied him a fair trial; he received ineffective assistance of counsel; and the evidence was "simply not sufficient to meet the demands of the statute or the indictment."

**ANALYSIS**

### I. "Certain Critical" Testimony and Videotape as Evidence

¶24. Harris argues that it was error to introduce a recording of his police interview after the investigator had already testified about the statements Harris made on the video. At trial, following Detective Jones's testimony about his interview with Harris, the State moved to enter the video of this same interview into evidence. The court then directed the jury to retire to jury quarters, and a lengthy discussion was had as to whether introducing the video was

9

cumulative evidence and prejudicial to the defendant. Defense counsel initially stated no objection when the State sought to move the interview into evidence. After the court questioned the State's attorney about the "waste of time" by asking the detective about Harris's statements and then introducing the video to be played relaying the same information a second time, the defense objected that it put "more weight" on that "specific piece of evidence." The defense's objection concerned bolstering or, as stated by defense counsel at trial, "essentially the same objection as what asked and answered is." Later, defense counsel did not include this objection (asked and answered, bolstering, or cumulative) in the motion to vacate the judgment or for a new trial. The defense used the word "cumulative" for the first time in his brief on appeal.

¶25.    In response to Harris's argument, the State maintains that "the investigator's testimony was not a comprehensive review of the interview" and that "the purpose of the investigator's testimony was to lay the foundation to introduce the video." The State further claims that because "Harris later sought to re-introduce the video during his case-in-chief," he cannot now claim it was error.[7]

¶26.    The admission of evidence is reviewed for an abuse of discretion. *Webb v. State*, 113 So. 3d 592, 597 (¶13) (Miss. Ct. App. 2012) (citing *Palmer v. State*, 986 So. 2d 328, 331 (¶12) (Miss. Ct. App. 2007)). The "discretion of the trial judge runs toward almost unlimited

---

[7]    At trial, Harris did not seek to "re-introduce" the entire video. He sought to introduce parts of the videotaped statement that had been redacted by the State pursuant to a pre-trial ruling prohibiting evidence relating to photographs the victim had sent to her boyfriend. A lengthy discussion occurred about what exactly was on the video and what parts Harris wanted to introduce.

10

admissibility regardless of the . . . repetitiveness" of evidence. *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987). Unless the trial judge's judicial discretion is abused, this Court will not reverse his ruling. *Lewis v. State,* 573 So. 2d 719, 722 (Miss.1990) (citing *Shearer v. State*, 423 So. 2d 824, 826 (Miss.1982)).

¶27. The Mississippi Supreme Court has "recogniz[ed] and endors[ed] a trial judge's duty to control the courtroom, using reasonable measures to efficiently move matters along[.]" *In re Blake*, 912 So. 2d 907, 914 (¶16) (Miss. 2005); *see Matthews v. State*, 288 So. 2d 714, 715 (Miss. 1974); *Aeroglide Corp. v. Whitehead*, 433 So. 2d 952, 953 (Miss. 1983) ("[A]ll courts possess the inherent authority to control the proceedings before them including the conduct of the participants."). "A court's power to maintain control over the proceedings before it is not grounded in its punitive jurisdiction, but in the necessary and inherent power to regulate its proceedings." *Spore v. State*, 214 So. 3d 223, 227 (¶9) (Miss. 2017) (internal quotation marks omitted) (quoting *Knott v. State*, 731 So. 2d 573, 576 (¶11) (Miss. 1999)).

¶28. Mississippi Rule of Evidence 403 provides, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, **wasting time, or needlessly presenting cumulative evidence**." (Emphasis added). When a trial court determines that potentially prejudicial evidence possesses sufficient probative value, it is within that court's sound discretion whether to admit it because the Rules of Evidence do not mandate exclusion; instead, they provide that the evidence may be excluded. *Burleson v. State*, 166 So. 3d 499, 508 (¶25) (Miss. 2015), *overruled on other grounds by Nevels v. State*,

11

325 So. 3d 627, 634 (¶20) (Miss. 2021).

¶29.    This Court was faced with the issue of cumulative evidence in *Lambert v. State*, 101 So. 3d 1172 (Miss. Ct. App. 2012).  In that case, the defendant was charged with touching a child for lustful purposes.  *Id*.  At trial, the victim testified.  *Id.* at 1176 (¶11).  Following her testimony, the State introduced a videotape of a forensic interview of the victim.  *Id.* Defense counsel objected to the admission of the tape on the grounds of cumulative evidence.  *Id.* The trial court admitted the video, and Lambert was convicted.  *Id.* at 1173 (¶1).  Lambert appealed.  *Id.*  On appeal, Lambert argued that "the jury did not need to hear repeated accounts on the videotape" and that "the probative value of the interview was outweighed by the danger of unfair prejudice."  *Id*. at 1176 (¶11).

¶30.    This Court emphasized the "great deal of discretion" enjoyed by a trial judge and found no abuse of that discretion in admitting the videotape.  *Id.*  This Court found that "while the videotape of the interview may have been cumulative in nature, [the victim's] testimony, as well as [the forensic interviewer's testimony], corroborated the contents of the interview on the videotape."  *Id.* at (¶12).  This Court noted that "even if the videotape was excluded, the jury would have still heard the statements on the videotape from oral testimony."  *Id.*  Finally, for purposes of argument here, even if admitting the videotape was improper, this Court in *Lambert* reminded us that "[w]here corroborative evidence exists and the hearsay evidence is **merely cumulative**, the admission may be held to be harmless." *Id*. (emphasis added) (citing *Young v. State*, 679 So. 2d 198, 203 (Miss. 1996) (citing *Jones v. State*, 606 So. 2d 1051, 1057 (Miss. 1992))).

¶31.   Here, it is questionable whether the "cumulative" objection was preserved for appeal. The defense attorney objected to questions "asked and answered" and the playing of the videotaped statement of Harris would place "more weight" on a particular "piece of evidence" but never actually uttered the word cumulative. Harris did not allege any sort of error as to this issue, regardless of the technical name of the objection, in his post-trial motion. Be that as it may, the trial court had considerable discretion in the admission or exclusion of evidence. The trial court criticized the State's counsel for what the court deemed to be a "waste of time." However, the trial court ultimately admitted the tape, and it was played for the jury. The State certainly has the right to decide how to present its evidence in accordance with the Rules of Evidence, and there is no precedent in this State that holds it is reversible error to admit cumulative evidence if indeed it was cumulative at all. *Young*, 679 So. 2d at 203; *see also Sanders v. State*, 757 So. 2d 1022, 1025 (¶5) (Miss. Ct. App. 2000); *Harrison v. State*, 724 So. 2d 978, 983 (¶11) (Miss. Ct. App. 1998); *Jones*, 606 So. 2d at 1057.

¶32.   The State pointed out the video revealed additional relevant evidence that the officer's testimony did not reveal. We find no reversible error. As such, we find that the trial judge acted with inherent authority "to control the courtroom," and the judge did not abuse his discretion in admitting the videotape following Jones's testimony. *In re Blake*, 912 So. 2d at 914 (¶16).

## II.    Ineffective Assistance of Counsel

¶33.   Harris lists a host of alleged deficiencies by his defense counsel at trial. Namely, he

13

asserts (1) lack of preparation, (2) failure to give an opening statement, (3) lack of familiarity with the State's video, (4) failure to obtain Harris's videotaped statement, (5) deficiency during his motion for a directed verdict, and (6) that counsel failed to submit jury instructions.

¶34.   "To succeed on an ineffective-assistance-of-counsel claim, [the defendant] must meet both prongs of the test laid out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984)." *Beasley v. State*, 355 So. 3d 245, 248 (¶6) (Miss. Ct. App. 2022) (citing *Lovett v. State*, 270 So. 3d 133, 135 (¶5) (Miss. Ct. App. 2018)), *cert. denied*, 355 So. 3d 774 (Miss. 2023). Under the two-part test in *Strickland*, "[t]he defendant must demonstrate [(1)] that his counsel's performance was deficient, and [(2)] that the deficiency prejudiced the defense of the case." *Ransom v. State*, 919 So. 2d 887, 889 (¶12) (Miss. 2005). "To determine the second prong . . . , the standard is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Harrell v. State*, 947 So. 2d 309, 313 (¶11) (Miss. 2007) (quoting *Mohr v. State*, 584 So. 2d 426, 430 (Miss.1991)). "In considering a claim of ineffective assistance of counsel, an appellate court must strongly presume that counsel's conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy." *Liddell v. State*, 7 So. 3d 217, 219 (¶6) (Miss. 2009).

¶35.   Concerning handling ineffective assistance claims on direct appeal, the Mississippi Supreme Court has held the following:

> It is unusual for [an appellate c]ourt to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal. . . . [An

14

appellate c]ourt will rule on the merits on the rare occasions where (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.

*Sanders v. State*, 228 So. 3d 888, 892 (¶17) (Miss. Ct. App. 2017) (citations and internal quotation marks omitted) (citing *Wilcher v. State*, 863 So. 2d 776, 825 (¶171) (Miss. 2003)). "We may also address such claims on direct appeal when the record affirmatively shows that the claims are without merit." *Gregg v. State*, 372 So. 3d 132, 137 (¶13) (Miss. Ct. App. 2023) (citing *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020)).

¶36. Further, "where the record cannot support an ineffective assistance of counsel claim on direct appeal, the appropriate conclusion is to deny relief, preserving the defendant's right to argue the same issue through a petition for post-conviction relief." *Brandon v. State*, 109 So. 3d 128, 134 (¶23) (Miss. 2013) (citing *Aguilar v. State*, 847 So. 2d 871, 878 (¶17) (Miss. Ct. App. 2002)). The State admitted in its brief that the record was "sufficient for the Court to review Harris's claim" on some issues but that the record was insufficient on others. We agree. However, Harris certainly has the right to raise arguments in post-conviction collateral proceedings. We will not address the issues Harris raises in this appeal concerning ineffective assistance of counsel in a piecemeal fashion. Therefore, we decline to address this issue, preserving for Harris the right to raise his claims in a post-conviction proceeding.

### III. Sufficiency of the Evidence

¶37. Harris argues the evidence was "simply not sufficient to meet the demands of the statute or the indictment." Harris was charged with the touching of a child for lustful

15

purposes under Mississippi Code Annotated section 97-5-23(2) (Supp. 2015), which provides the following:

> Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, any child younger than himself or herself and under the age of eighteen (18) years who is not such person's spouse, with or without the child's consent, when the person occupies a position of trust or authority over the child shall be guilty of a felony.

In considering whether the evidence is sufficient to sustain a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Clements*, 237 So. 3d at 181 (¶35) (citing *Williams v. State*, 35 So. 3d 480, 485 (¶16) (Miss. 2010)). Where the facts and inferences "point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty," the proper remedy is to reverse and render. *Id.* However, if "reasonable fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed sufficient. *Id*.

¶38. "Our Supreme Court has held that the unsupported word of [a] victim of a sex crime is sufficient to support a guilty verdict where that testimony is not discredited or contradicted by other credible evidence[.]" *Clements*, 237 So. 3d at 181 (¶39) (citing *Collier v. State,* 711 So. 2d 458, 462 (¶15) (Miss. 1998)). The State presented sufficient evidence to support Harris's conviction of the touching of a child for lustful purposes. The State provided

16

evidence that Harris was over the age of eighteen on the date of the incident and that he occupied a position of trust or authority over T.H. Section 97-5-23(2) specifically lists examples of a "person in a position of trust or authority over a child" and explicitly includes the term "parent." As T.H.'s biological father with visitation, Harris certainly occupied a position of trust or authority. Further, the State presented testimonial evidence that Harris "put his hand in [T.H.'s] underwear," and as his hand lowered, he touched her "private area in between her legs." T.H. testified that she squeezed her legs together in an effort to prevent Harris from penetrating her. T.H. further stated that after he "took" his hand away, he moved his lower body against "[her] butt." Finally, T.H. testified she was fourteen years old at the time of the incident. Considering all these facts in light of section 97-5-23(2), a rational juror clearly could find all elements of the crime beyond a reasonable doubt. Furthermore, T.H.'s unsupported testimony was sufficient to support the conviction. *Clements*, 237 So. 3d at 181 (¶39). "It is a well-settled principle of law that issues of weight and credibility of witness testimony are within the sole province of the jury as fact-finder." *Lyles v. State,* 12 So. 3d 552, 555 (¶15) (Miss. Ct. App. 2009) (quoting *King v. State*, 798 So. 2d 1258, 1262 (¶14) (Miss. 2001)); *accord Williams v. State*, 544 So. 2d 782, 758 (Miss. 1987). "The jury has a much better vantage point to view and assess the tone, mannerisms, and disposition of witnesses." *Lyles*, 12 So. 3d at 555 (¶15). The jury apparently found T.H.'s testimony to be credible, and it is not our role to now second guess the jury's credibility determination. Accordingly, we find sufficient evidence was presented to support Harris's conviction.

**CONCLUSION**

17

¶39.   The trial judge did not abuse his discretion by admitting the testimony and recording into evidence.  The evidence was sufficient to convict Harris.  Accordingly, we affirm, but we do not decide the issue of ineffective assistance of counsel so that Harris may proceed with the claim in post-conviction collateral relief proceedings.

¶40.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**